## Case No. 3,550.

### DALTON v. RECEIVERS.[1]

[4 Hughes, 180.]

Circuit Court, E. D. Virginia. 1882.

MASTER AND SERVANT—NEGLIGENCE—WIRE ABOVE RAILROAD TRACK IN STREET.

[1. A wire stretched across a public street in a city, 16 feet 5 inches above the track of a railroad, and about the height of a man's chin when standing on the top of a freight car, is not a structure against which a railroad company can be presumed to guarantee its employes from accidents.]

[2. But, even if this were not true in the case of a wire put up by authority of the railroad company, the receivers of the road are not liable for an accident caused by such a wire put up by other parties, and not connected to the railroad premises, nor owned, used, controlled, or known of by the railroad authorities.]

[3. The death of a railroad employe, caused by a telephone wire stretched across the street about five feet above the tops of freight cars, must be considered as due in part to his own negligence and that of his coservants, where it appears that, being employed in switching upon the street, and in the yards in its immediate vicinity, they had passed under the wire a number of times during the several weeks it had been in place, without reporting its existence to their superiors.]

[4. The failure of the yard master, who was the immediate superior of deceased, to report the wire, was not such gross and extraordinary negligence as to be an exception to the rule exempting the master from liability for negligence of coservants.]

[This was an action by A. J. Dalton, administrator of Stephen Campbell, against the receivers of the Atlantic, Mississippi & Ohio Railroad Company, to recover damages for the death of said Campbell.]

OPINION OF THE COURT. This is a proceeding assimilated to the statutory one authorized by state law, to recover from the receivers of the Atlantic, Mississippi & Ohio Railroad (a road now in the custody of this court) damages to the amount of $5,000 for the death of Stephen Campbell, an employe of the receivers. The authorities of this railway have had permission from the city of Norfolk, since 1857, to lay down their tracks in, and to run their cars along, the streets of the city, at a speed not exceeding the rate of five miles per hour. The following is the source of this privilege: Resolution adopted

---

[1] [The opinion in this case is published from a copy certified by the clerk of the court from the records in his office.]

by the common council, January 26, 1857, and concurred in by the select council, January 27, 1857: "That the Norfolk and Petersburg Railroad Company be, and they are hereby, authorized and granted the right and privilege to enter upon and lay the track of their road in any and upon such of the streets of this city as the directors of said company may deem fit, proper, and prescribe for their use and purposes, either in the loading or unloading of cars, as well as the transit of cars, engines, and trains; on the express condition, however, that the speed of their cars, engines, or trains shall not, within the limits of the city, exceed a rate of five miles per hour." No power over the streets, other than is embraced in this grant of privilege, is given. The train yard and terminal depot of the railroad are at the east end of Wide-Water street. In the exercise of the privilege conferred by the city, the railway authorities have laid down a track from this train yard and depot along Wide-Water street nearly to its western terminus, and thence, by a cross street, northwardly into the yard and wharf of the Boston steamers. Branch tracks are also laid from the track on Wide-Water street, near its eastern end, into the yards and wharves, respectively, of the Clyde steamers and the New York steamers. The yards of these several steamship companies are inclosed by fences and gates, with beams across the tops of the gates, high enough, in each instance, to allow the smokestacks of the engines to pass under them clear; that is to say, at a greater or less number of feet above the tops of the freight cars drawn by the engines. The heights of these several objects above the track of the railroad are, respectively, as follows: Height of walking boards on top of cars of the Atlantic, Mississippi & Ohio Railroad, 11 feet 5 inches. Height of smokestacks of the company's engines used on Wide-Water street, 14 feet 3½ inches. Height of top beam of gate entering Clyde's wharf, 15 feet 7¼ inches. Height of gate entering New York steamer's wharf, 14 feet 9½ inches. Height of gate entering Boston steamer's wharf, 14 feet 9½ inches. The freight cars from one or two distinct roads are somewhat higher than those of the Atlantic, Mississippi & Ohio road. It may also be noted that the trains of the railroad coming in from the country enter its train yard and depot just after passing an iron bridge under a gallows frame at the end of that bridge, which is 15 feet 1¼ inches above the track. From these figures it will be observed that the tops of the smokestacks of the engines are 2 feet 10½ inches higher than the walking boards of the Atlantic, Mississippi & Ohio cars; that the gates of the New York and Boston steamers' wharves are both 3 feet 4½ inches higher; that the gallows frame of the company's iron bridge east of the depot is 3 feet 8¼ inches higher; and that the gate of Clyde's wharf is 4 feet

2¼ inches higher than the top of the Atlantic, Mississippi & Ohio cars. Some time about the 15th of September, 1880, a society of Norfolk cotton merchants put up a fire-alarm wire across Wide-Water street, towards its west end, near the point at which the track of the Atlantic, Mississippi & Ohio road leaves it in the direction of the Boston wharf. This was a private fire alarm intended for the protection of the cotton on the wharves near that point. There is no ordinance of the city forbidding the erection of such a wire, or requiring previous permission for its erection to be obtained, and no previous permission was obtained in this case. This wire was placed at a height which was chin high to a man of medium stature standing erect on the top of the Atlantic, Mississippi & Ohio Railroad cars; that is to say, about five feet above the top of these cars, or 16 feet 5 inches above the railroad track. Stephen Campbell, the deceased, was a switcher and coupler on the trains on Wide-Water street which ran between the train yard and the Clyde, New York, and Boston steamers' wharves. He had been in the employment of the railroad authorities 12 years, and had been on this particular service 5 years. Part of his duty was to see when a train moved that all the cars intended to be taken were coupled, and then to stand forward on top of cars as a lookout and give signals to the engineer on the locomotive. On the 18th of October, 1880, about 8 o'clock in the evening, as a train on which he stood was moving from the direction of the Boston wharf into Wide-Water street, on its way to the yard, this employe, the deceased, Stephen Campbell, while standing on top of a car of the train, facing forward towards the locomotive, was caught under the chin by the fire-alarm wire before mentioned, which had been there erected across the street, thrown suddenly between two of the moving cars, down upon the railroad track, and run over and instantly killed. The night was a bright moonlight night. It was light enough for a sailor, John Burk, who happened to be on the sidewalk of the street at the time, and who testified in this case, to see the accident and how it occurred, and that the wire caught the deceased under the chin, and that he was standing erect at the time, and thrown down and killed. Campbell was a colored man.

The testimony of Hardy, who was the mate of Campbell in the particular duties belonging to him in that service, and that of other employes who testified in this case, is that the men on the trains, in approaching that wire, were in the habit of catching it in their hands and lifting it over their heads as they passed. Hardy says that he did this several times; adding: "At the time I did it I never thought that it would be the occasion of any man's death by pulling any person off. I don't think the wire had been there over thirty days. I never said anything to

Stephen Campbell about it. It was just as handy for me to lift it over my head in the daytime, never thinking it would be the cause of any one's death." Hardy says that the deceased never mentioned the wire to him. The wife of the deceased testifies that Campbell never mentioned the wire to her, or said that it was dangerous. Roberts, the night yard master, and immediate superior of Stephen Campbell, the deceased, testifies: "My attention was first called to the wire across Wide-Water street about two or three weeks before the accident,—may be longer. 'Mind the wire, Mr. Roberts,' was frequently said to me by the train hands as we passed under it, giving me notice before getting to it. * * * I suppose it would have been the business of any one that noticed it to report the condition of the wire." He added that he did not report it. Hickey, the engineer, testifies that he thought the wire was too low, and that he heard that it had been reported, as he supposes, to the yard master. He did not report it. Campbell, the deceased, Hardy, his mate, Roberts, the train yard master, and Hickey, the engineer, had all frequently passed under the wire, had all known that it was there for several weeks before the accident, and had neither of them made any complaint either to each other, or to any one else, that it was too low, or had made report of it to any of their superiors in authority. There is, no proof that either of the receivers, the defendants in this proceeding, knew of the existence of the wire, and no ground for believing that any subordinate officer of theirs, superior in grade to Roberts, had any knowledge of it. There is no pretense that Stephen Campbell, the deceased, ever made complaint concerning the wire, either to the receivers, or to any of his superiors in office, or to his equals among the employes, or to any one whatever. It is proper to add that it is not claimed that Stephen Campbell was other than sober at the time of the accident, or was other than a sober man and faithful servant.

I think the foregoing statement embraces all the facts material to the decision of the questions which control this case. The trains of the Atlantic, Mississippi & Ohio road, upon which the deceased was employed, were not running upon premises owned and controlled by the railroad's own authorities. They were running by permission, upon the street of a city, full and complete jurisdiction over which belonged to the government of the city. The wire which caused the accident was not stretched across the property of the railroad, but across the property of the city. It was attached at each end to the property of private citizens. The wire did did not belong to the railroad company, and was not put up by them; it was put up by private individuals under the implied permission of the city, under a natural right not prohibited by any positive law. If the wire was an obstruction to the public in any re-

spect, it was primarily the duty of the city of Norfolk to remove it. If it was an obstruction, I think it cannot justly be contended that the authorities of the railroad would have had the right to remove it except upon the refusal of the city to do so.

The case does not fall within the ruling of those numerous decisions of the courts requiring railroads to remove obstructions from their own property and territory, from premises entirely under their ownership and control. It is a case in which the accident happened upon premises not belonging to the railroad. In the recent case of an accident which happened to an animal from a defect —a hole—in the track of this railroad in this same Wide-Water street in this city, where demand was made upon the city for the damage resulting, the city, acknowledging its responsibility and primary liability, paid the demand, and then sued these receivers for the amount paid, basing its claim on the ground that they were bound to keep their track in good repair, and were responsible for leaving a dangerous hole in the track. See papers in Ex parte Dawley, filed in this Atlantic, Mississippi & Ohio case. Whether the receivers are bound in that case is a question now before me for decision; and I am of impression that, although the receivers are not bound for every structure that may be erected by the city or by individuals in Wide-Water street, they are bound to keep in good order the track which the railroad company has itself laid down for its own exclusive benefit and use by express permission of the city. But because the railroad authorities are bound to keep its track, laid down in a public street, owned and controlled by themselves, in safe condition as to the public, it does not follow that they are bound for all other structures in such a street, such as a telephone wire erected by permission of the city, attached at each end to private property, not owned or used by themselves, and not subject to their control. The distinction between this case and those cited by counsel for plaintiff is palpable. These cases are all cases of railroads or employers erecting or permitting structures on their own premises.

The case of Chicago, B. & Q. R. Co. v. Gregory [58 Ill. 273] was one in which the railway company itself placed near its track on its own property a mail catcher, by which the intestate of the plaintiff was struck and killed, at a place where two other accidents had happened from the same cause, after the company had had full notice. Certainly that was a very different case from the one with which we are now dealing. In the strong case for the plaintiff of Bessex v. Chicago & N. W. Ry. Co. [45 Wis. 477], the plaintiff was employed in the defendant's car shops at Fond du Lac to move cars upon the side tracks near such shops, and while assisting in moving a car by direction of the yard master, and pushing it along, and approaching some boards covering a small pile of lum-

ber eighteen inches or two feet high, which was within three or four feet of the track and had been there for a year or more, and not being able to pass between the pile and the car, he stepped upon a misplaced board covering the pile, which gave way, throwing him down under the car, and causing the injury complained of. The accident happened in the defendant's yard upon its own premises. The pile of lumber had been placed there by the employes of the company, and had been habitually walked over exactly as plaintiff had attempted to do by numerous hands of the company for a year. It was a case in which great indifference was shown to the safety, convenience, and comfort of the employes of the defendant; and yet the court decided nothing in the case except that the question, of negligence or not, was a proper one for the jury. In the case of Lovejoy v. Boston & L. R. R., 125 Mass. 79, where an employe on a moving train was killed by his head coming in contact with a post placed by the side of its track by the company, it was held, there was no negligence as to this post on the part of the defendant, though the post was erected by the company on its own premises for its own purposes, and could be removed at its own will. There was a like ruling in the case of Gibson v. Erie Ry. Co., 63 N. Y. 449, where the injury was sustained from the projecting roof of a depot building of the defendant, standing upon its own premises and absolutely subject to its own control. The ground of the decision was, that this projection of the roof was a fact patent to all, well known to the deceased, and was one of the risks he assumed as an employe of the company. I need not adduce further citations on this point. The cases in the books all seem to apply to obstructions erected on the premises of the defendant railroad companies, either by the act or permission of the companies themselves. None of them seem to apply to obstructions erected in the public streets of cities or on other premises than those of the railroads, by persons who were strangers to the railroad authorities, for purposes either lawful or unlawful in themselves. But assuming, for the sake of argument, that a railroad company is just as responsible for obstructions erected in the public streets of a city in which it is permitted to run its trains, as if they were erected upon its own premises and property, is the present case one in which railroad receivers should be held responsible? As these receivers, living in distant cities, could not know personally of obstructions erected over their railroad track in a street in the city of Norfolk, except by report of their own employes, engaged in service in that street, and as there is no proof that any report of the erection of this wire was made to them, the negligence for which they would be responsible in this case, if responsible at all, would be that of the deceased himself, or

of his coemployes, Hardy or Hickey or Roberts, in not so reporting; the last named being one grade higher than the deceased in the service. It is very clear that Hickey and Hardy were no more bound to report the obstruction than Stephen Campbell himself; and his sole claim for damages, therefore, rests upon the theory that Roberts was negligent in not making report of the obstruction. And so the question here is that of the responsibility of an employer for the supposed negligence of one employe as to another employe.

The latest decision of the supreme court of the United States (that in Hough v. Railway Co., 100 U. S. 213) furnishes the general principles of law which control this case. There, the familiar and well-settled general doctrines are distinctly admitted,—that he who engages in the employment of another for the performance of specified services and duties, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services, and that there is no principle which should except from this rule the perils arising from the carelessness and negligence of those who are in the same employment. Wharton, in his work on Negligence (section 225), thus announces the latter principle: "It is well settled that one who enters the service of another takes upon himself the ordinary risks of the employment in which he engages, including the negligent acts of his fellow workman in the course of the employment." Pierce, in his work on Railroads (page 358), after giving the rule, adds the reason of it, as follows: "To extend the master's liability further, and hold him liable to his servants in like manner as to third persons for negligent acts of fellow-servants, would, it has been deemed by the best judicial opinion, encourage persons engaged in a common service to be less observant of each other's fidelity, and less disposed to report to the employer instances of their incompetency and untrustworthiness." The broad principle, therefore, is that, while the employer is responsible to the employed for the selection of competent employes for the particular services to which they are assigned, he is not in general responsible to their fellow-servants for ordinary negligence in the performance of those services. There are, of course, many exceptions to the rule, where the circumstances of particular cases justify a departure from the general principle; but the rule itself is recognized by all courts. One exception was that shown in the case of Hough v. Railway Co., already cited. The cowcatcher of an engine had got out of order, and the engineer had reported its condition to the master machinist, who had promised a number of times to rectify it, but had failed to do so; and an accident had finally happened from this cause, by which the engineer lost his life. Here was a case of exceptionally gross negligence on the part of a

superior officer to the engineer, in a matter in which he was representative of the company itself; and one of the questions was whether the engineer, in consenting to go upon the engine having this defective cowcatcher attached, had not waived his right to claim damages. The ruling of the court was that the questions of the company's negligence and of the engineer's contributory negligence were such as should be given to a jury to decide; and that the engineer, by continuing in service, notwithstanding the defective machinery, after having been promised that it should be repaired, did not ipso facto forfeit his right to damages. Every case in the books, of exception to the general rule of the nonliability of the master to one servant for the negligence of another servant, turns upon the particular and peculiar circumstances in that especial case extraordinary enough to make it exceptional. Were there any such extraordinary features in the conduct of Roberts, in this case, as to make his conduct exceptional? Stephen Campbell had made no complaint to Roberts, and had not thought the existence of the wire, in the place where it was, a matter of sufficient importance for mention in ordinary conversation. Hardy had made no complaint, and had treated the matter with like indifference. Roberts, although he had passed under the wire several times, and had been warned to stoop to it in passing, had not regarded it as dangerous, or thought it his duty to report it. In fact, there was no complaint of the wire by any one to any one, and no report of it by any employe of the company or other person to any officer of the company whatever. Not until a fatal accident had happened, did any person regard the cause of it with any serious consideration. I do not think, therefore, that there was anything in the failure of Roberts to report the wire to the authorities so extraordinarily reprehensible as to make this case exceptional, and take it out of the operation of the general rule. But, be all that has been said just or not, I think the question above and before all others in the present case is whether the wire stretched across a public street of Norfolk at a height of some 16 feet 5 inches above the railroad track, was in fact an unlawful obstruction. What might be deemed an obstruction if found on a part of a railroad where passenger trains move at the rate of 40 miles an hour, and freight trains at the rate of 15 miles, would not necessarily be so on the street of a city, where trains are required to move more slowly and cautiously, with the warning bell of the locomotive constantly ringing, and at a speed not allowed to be more than 5 miles an hour. The object in sending the freight trains of this road into the city is that they may deposit or receive freight in the wharves of the steamers of the several lines which run in connection with the road; and these wharves are fenced by enclosures the entrances to which are covered by structures some 2 feet lower than this wire. The particular train on which this accident happened had, but a moment before, emerged from the Boston wharf, and passed under a structure much lower than the wire. From the nature of their service on these slowly and cautiously moving trains, running on a crowded street, the employes were required and accustomed to be on the lookout for all such structures as might impede the street, whether permanent or temporary; and a court could not justly presume that the authorities of the railroad undertake to guarantee them against accidents from such objects. I do not think this guarantee existed any more with reference to the wire which caused the accident under consideration than it does with reference to the entrances to the several wharves to and from which the trains ran on which the deceased man was employed. To hold that the wire in question was an obstruction guaranteed against by the authorities of this road would be equivalent to requiring the removal of the gates forming the entrances to all the wharves into which their trains run in this city in conducting the heavy freight business of this road. Indeed, such a ruling would reach much further. To hold that a structure 16 feet 5 inches above the track of a railroad is unlawful and dangerous would be to require the railroads of the country to reconstruct every one of the hundreds and thousands of tunnels and metallic and covered bridges now on their lines. I would shrink from such a ruling in any case; I must especially do so in this.

The petition must be dismissed on several grounds: First, that a structure across a public street in a city, 16 feet 5 inches above the track of a railroad running there, is not one against which a railroad company can be presumed to guarantee its employes from accidents; second, that even if it could be regarded as such, yet this wire, not being on the railroad premises, nor owned, nor used, nor put up, nor controlled, nor known of, by the authorities of this railroad, there can be no recovery against them for an injury sustained from it; and, third, if this wire had been an obstruction, the deceased employe was guilty of neglect in not reporting or complaining of it during the several weeks it was up before the accident happened; and the negligence of Roberts, his immediate superior fellow employe, in not reporting it, was not of so extraordinary and gross a character as to make it an exception to the general rule that an employer does not guarantee one servant against the negligence of a fellow servant in the performance of the duties in which they are regularly employed. Let the petition be dismissed, but without costs.